<u>NOT FOR PUBLICATION</u>

### UNITED STATES DISTRICT COURT
### DISTRICT OF NEW JERSEY

| | |
|---|---|
| ANTHONY DEWOLF; WALTER RIVERA; EDWIN NARVAEZ; RONNY THREADGILL; JOSE GARCIA; ROBERT JUNIOR MEDINA; JOSE LUIS COLON, JR.; AUDELIS VAZQUEZ; MARCEL PORTER; VICTOR TERRERO; LUIS GONZALEZ, <br><br>*Plaintiffs*, <br><br> v. <br><br> HYDROCHEMPSC; HYDROCHEM LLC; HYDROCHEM INDUSTRIAL CLEANING, LLC; CORPORATIONS 1-10, <br><br> *Defendants*. | Civ. No. 20-3378 (KSH) (CLW) <br><br><br> **OPINION** |

**Katharine S. Hayden, U.S.D.J.**

**I.   Introduction**

Plaintiffs Anthony DeWolf, Walter Rivera, Edwin Narvaez, Ronny Threadgill, Jose Garcia, Robert Junior Medina, Jose Luis Colon, Jr., Audelis Vazquez, Marcel Porter, Victor Terrero, and Luis Gonzalez ("plaintiffs") have sued defendants HydroChemPSC, HydroChem, LLC and HydroChem Industrial Cleaning, LLC ("HydroChem") for allegedly violating two New Jersey wage statutes: (1) N.J.S.A. § 34:13B-2.1, which addresses the payment of prevailing wages for construction on public utilities, and (2) N.J.S.A. § 48:2-29.47, which addresses the payment of prevailing wages for construction undertaken in connection with Board of Public Utilities ("BPU") financial assistance. HydroChem has moved to dismiss the amended complaint. As set forth below, the motion will be granted in part and denied in part.

1

**II.     Background**

The amended complaint alleges as follows. Plaintiffs worked for HydroChem on projects for Public Service Electric & Gas (PSEG), a utility company. (D.E. 76, Am. Compl. ¶¶ 3, 9.) HydroChem is in the business of "large scale, industrial environmental and hazardous waste containment and removal services including those integral to industrial construction and demolition projects." (*Id.* ¶ 7.) PSEG "retained, used, and employed HydroChem" to provide services for its Energy Strong program, and HydroChem in turn assigned each of the plaintiffs to perform work on PSEG facilities. (*Id.* ¶¶ 73, 75.)

The Energy Strong program had its origins in a series of storms, including Superstorm Sandy, that struck New Jersey in 2011 and 2012 and caused "severe damage to the State's utility infrastructure." (*Id.* ¶ 45.) In February 2013, PSEG petitioned the BPU for approval of an "infrastructure program and associated financial aid to bolster its 'electric and gas infrastructure to make them less susceptible to damage from wind, flying debris and water damage in anticipation of Major Storm Events.'" (*Id.* ¶ 46.) The program that the BPU ultimately approved involved PSEG committing to invest $1.22 billion in its electric and gas infrastructure, including "flood mitigation," which incorporated the raising or relocation of more than two dozen electrical substations. (*Id.* ¶¶ 50, 53, 56.)

As plaintiffs characterize the BPU proceedings, approval of the Energy Strong program reflected a continuation of state-initiated efforts that began around 2009 (and of which PSEG availed itself) to permit accelerated cost recovery, through rate increases and favorable depreciation treatment, as a means of encouraging utilities to invest in their infrastructure. (*Id.* ¶¶ 26-33, 41-63.) Approval of such measures fell outside the normal ratemaking processes (*e.g.*,

2

*id.* ¶ 33), and the approach more generally was formalized in regulations promulgated in 2018 (*i.e.*, after the Energy Strong program was approved) (*e.g., id.* ¶¶ 34-37).

Raising electrical substations—the component of Energy Strong that plaintiffs allegedly worked on—involves "wholesale demotion of existing large electrical power transformers . . . and the construction of new, larger replacement transformers at higher elevations." (*Id.* ¶ 68.) Because transformers require "thousands of gallons of transformer oil" for operation and insulation, demolishing and retiring them involves emptying the oil tank, "including contemporaneous containment and removal of any spillage or contaminated soil, water, or other material," and building new transformers involves filling a new tank with transformer oil and engaging in "associated contemporaneous environmental containment and removal work." (*Id.* ¶¶ 69-71.) Demolition and construction of transformers also involves erecting "secondary containment structures such as berms, frac tanks, and drums; continuous environmental monitoring ('environment watch') during the oil pumping and removal process; and the removal and ultimate disposal of contaminated soil, water, and other material and structure parts." (*Id.* ¶ 72.)

What HydroChem (and by extension plaintiffs) did included "pumping transformer oil; and monitoring, containing, storing, and ultimately removing oil, soil, water, and other pollutants and contaminants from within and underneath the transformers on the PSE&G worksites." (*Id.* ¶ 76.) They used equipment and machinery such as "containment units, vac-trucks, frack-tanks, roll frames, rack trucks, box trucks, skid steers, berms, submersible pumps, drums, and water blasters." (*Id.* ¶ 77.) Plaintiffs also handled environmental watch and containment during installation of the transformers and removed contaminants and other materials. (*Id.* ¶ 77.)

Plaintiffs "generally documented their work and hours at PSE&G worksites on both electronic and written time/work sheets that were submitted to HydroChem management/payroll,

3

and which were then used by HydroChem to invoice and charge PSE&G for the work." (*Id.* ¶ 78.) Plaintiffs assert that although they were entitled to be paid prevailing wages for their work, HydroChem has "failed and refused" to do so. (*Id.* ¶¶ 81-82; *see also id.* ¶¶ 93, 101.)

Plaintiffs filed suit on February 26, 2020, in New Jersey state court, asserting claims under N.J.S.A. §§ 34:13B-2.1 and 48:2-29.47, as well as for breach of contract and violation of the New Jersey Prevailing Wage Act ("NJPWA"), N.J.S.A. §§ 34:11-56.25 to -47. (D.E. 1-1.) HydroChem removed the action to this Court on March 27, 2020, asserting diversity jurisdiction (D.E. 1), and moved to dismiss the complaint for lack of standing and failure to state a claim (D.E. 3).

In November 2020, after HydroChem's motion was fully briefed, this Court issued an opinion in an unrelated action, captioned *Cosgrove v. Veolia ES Industrial Servs., Inc.*, 18cv173 (hereafter, "*Cosgrove*"). The *Cosgrove* plaintiffs, represented by the same attorney who represents plaintiffs in this action, alleged that a different company, Veolia ES Industrial Services, Inc., now known as Clean Harbors Industrial Services, Inc. ("VESIS"), failed to pay prevailing wages for work those plaintiffs did on the Energy Strong program. They asserted that VESIS violated the same two statutes underlying the claims in this action, *i.e.*, N.J.S.A. §§ 34:13B-2.1 and 48:2-29.47. In its November 2020 ruling, which granted in part and terminated in part the defense's motion for judgment on the pleadings, the undersigned (1) directed the parties to brief whether a private cause of action exists under N.J.S.A. § 34:13B-2.1, and (2) dismissed without prejudice the claim under N.J.S.A. § 48:2-29.47 because the operative complaint failed to adequately plead an "incentive," and therefore had not met the BPU "financial assistance" requirement of the statute. (*Cosgrove*, D.E. 136, 11/30/20 Op.) The *Cosgrove* plaintiffs later amended their complaint with leave of court to reinstate the claim under N.J.S.A. § 48:2-29.47. (*Cosgrove*, D.E. 146, 165.) VESIS moved to

4

dismiss that claim, and, as further discussed below, the Court has denied that motion in an opinion that is being filed contemporaneously with this one.  (*See Cosgrove*, 9/30/22 Op.).

In May 2021, plaintiffs moved to amend the complaint in this action to reflect changes they had made to their claim under N.J.S.A. § 48:2-29.47 in response to the November 2020 ruling in *Cosgrove*. (D.E. 43.) Judge Waldor granted that motion on November 23, 2021, holding that there was good cause under Fed. R. Civ. P. 16(b) to permit amendment beyond the deadline set forth in the scheduling order and that the requisites for amendment under Rule 15 were met.  (D.E. 61, 62.) She ordered plaintiffs to file their amended complaint within 7 days.  (D.E. 62.)

Recognizing that plaintiffs had not done so, and that both sides contemplated the filing of the amended complaint and a renewed motion to dismiss, this Court issued an omnibus order setting a schedule for both sides to act.  (D.E. 75.)[1]  The amended complaint, filed the same day as the Court's order, asserts two claims: Count I, for violation of N.J.S.A. § 34:13B-2.1,[2] and Count II, for violation of N.J.S.A. § 48:2-29.47.[3]  HydroChem moved to dismiss on July 29, 2022. (D.E. 80.)  Plaintiffs opposed (D.E. 85, Opp. Br.), and HydroChem replied (D.E. 87, Reply Br.).

### III.   Discussion

HydroChem seeks dismissal of the amended complaint under Fed. R. Civ. P. 12(b)(1), for lack of standing, and Fed. R. Civ. P. 12(b)(6), for failure to state a claim.  As to Count I, it argues that the claim fails because there is no private right of action under N.J.S.A. § 34:12B-2.1.  It also

---

[1] In the same order, the Court addressed HydroChem's appeal from Judge Waldor's order denying a stay of discovery, remanding the issue and terminating the appeal. (D.E. 75, at 2-3.) HydroChem then moved for reconsideration before Judge Waldor; that motion remains pending. (*See* D.E. 78.)

[2] Count I also cites N.J.S.A. § 34:13B-16, but that section merely supplies definitions.

[3] Plaintiffs have dropped the breach of contract and NJPWA claims that appeared in their original complaint.

5

argues that the labor commissioner did not make a finding that the statute was violated, that plainiffs did not perform qualifying "construction work," and that the amended complaint's factual allegations do not plausibly plead a violation of the statute. As to Count II, HydroChem contends the Energy Strong program did not get "financial assistance" from the BPU and plaintiffs are not "workers" under the statute, and that the pleading is insufficient under Rule 12(b)(6).

### A. Standard of Review

As noted, HydroChem has moved to dismiss both for lack of standing and for failure to state a claim. Although HydroChem frames its standing arguments as jurisdictional and asserted under Fed. R. Civ. P. 12(b)(1),[4] the substance of those arguments challenges whether plaintiffs are covered by the respective statutes and whether their allegations satisfy the elements of those statutes. These challenges are to statutory, not constitutional, standing. *See Leyse v. Bank of Am. N.A.*, 804 F.3d 316, 320 (3d Cir. 2015) (explaining that "statutory standing is not jurisdictional," and is directed to whether a particular plaintiff has the right to sue under a statute; it "does not limit the power of the court to adjudicate the case" (citing *Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118, 128 & n.4 (2014)).[5] Challenges to statutory standing are evaluated by the same standard that governs motions to dismiss under Fed. R. Civ. P. 12(b)(6). *Id.*; *accord Baldwin v. Univ. of Pittsburgh Med. Ctr.*, 636 F.3d 69, 73-74 (3d Cir. 2011).

HydroChem's arguments, therefore, will be evaluated using the same test, whether categorized as a matter of standing or of the sufficiency of the pleading: the Court considers the

---

[4] A standing challenge under Rule 12(b)(1) changes the procedure in several significant respects from the evaluation of a motion to dismiss under Rule 12(b)(6), including "invert[ing] the burden of persuasion" so that it rests on plaintiff and widening the scope of material the Court may consider. *Potter v. Cozen & O'Connor*, 46 F.4th 148, 154-55 (3d Cir. 2022).

[5] HydroChem's briefing does in one instance appear to recognize that its standing arguments are, at bottom, about statutory standing. (*See* Moving Br. 21 ("In short, Plaintiffs do not fall within the ambit of the statute. Plaintiffs' claim must therefore be dismissed for lack of statutory standing.").)

6

claim elements against the well-pled factual allegations, disregarding legal conclusions, conclusory allegations, and any "formulaic recitation of the elements" of the cause of action, and assesses whether plaintiffs have pleaded a plausible claim for relief. *Lutz v. Portfolio Recovery Assocs.*, __ F.4th __, 2022 WL 4295631, at *3 (3d Cir. Sept. 19, 2022). The Court assumes the truth of plaintiffs' factual allegations for purposes of the motion, construes them in plaintiffs' favor, and draws reasonable inferences in their favor. *Id.* If the Court can reasonably infer from the complaint's factual content that the defendant is liable for the misconduct alleged, plaintiffs have pleaded a plausible claim for relief. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

### B. Count I

Here, plaintiffs have failed to plead a plausible claim for relief in Count I because the statute underlying that claim does not give them the right to sue in the first place. In this count, plaintiffs have asserted that N.J.S.A. § 34:13B-2.1 required HydroChem to pay them prevailing wages and that it failed to do so. The statute provides, in pertinent part, as follows:

> Any employee employed by a construction contractor engaged in construction work on a public utility shall be paid the wage rate for their craft or trade as determined by the Commissioner of Labor and Workforce Development pursuant to the provisions of the [NJPWA].

To enforce that right, the statute refers to two provisions in the NJPWA that create a disorderly persons offense for violations of that act; allow the labor commissioner to assess administrative penalties, make a referral for prosecution, and issue stop-work orders; and allow the labor commissioner to supervise the payment of amounts due to workers:

> A construction contractor who is found by the Commissioner of Labor and Workforce Development to be in violation of the provisions of this section shall be subject to the provisions of sections 11 and 12 of P.L.1963, c.150 (C.34:11-56.35 and 34:11-56.36) [N.J.S.A. §§ 34:11-56.35, 36] which apply to an employer for a violation of P.L.1963, c.150 (C.34:11-56.25 et seq.) [*i.e.*, the NJPWA].

*Id.* § 34:13B-2.1. The Court extensively addressed this statute in *Cosgrove* and concluded that no private right of action exists under it, either expressly or impliedly. (*See Cosgrove*, 9/30/22 Op. 3-11.) The same rationale defeats plaintiffs' identical claim in this case, and their briefing here offers nothing that would undermine the Court's conclusion in *Cosgrove*; in fact, their arguments are substantively identical. (*Compare* Opp. Br. 27-37 *with Cosgrove*, D.E. 143, Pls.' Supp. Br. 1-7.) Because this defect cannot be remedied with an amended pleading, Count I will be dismissed with prejudice.[6] *Lutz*, 2022 WL 4295631, at *8 (if amendment would be futile, dismissal with prejudice is appropriate).

### C. Count II

In Count II, plaintiffs assert that HydroChem was required under N.J.S.A. § 48:2-29.47 to pay them prevailing wages and failed to do so. In seeking dismissal, HydroChem counters that plaintiffs may not invoke the statute because they are not "workers" and because the Energy Strong program involved no BPU "financial assistance." As relevant to the parties' arguments, § 48:2-29.47 provides as follows:

> Not less than the prevailing wage rate shall be paid to ***workers*** employed in the performance of any ***construction undertaken in connection with Board of Public Utilities financial assistance***, or undertaken to fulfill any condition of receiving Board of Public Utilities financial assistance, including the performance of any contract to construct, renovate or otherwise prepare a facility, the operations of which are necessary for the receipt of Board of Public Utilities financial assistance . . . . The prevailing wage rate shall be the rate determined by the Commissioner of Labor and Workforce Development pursuant to the provisions of [the NJPWA]. For the purposes of this section, ***"Board of Public Utilities financial assistance" means any tax exemption, abatement or other incentive or any rebate, credit, loan, loan guarantee, expenditure, investment, grant, incentive, or other financial assistance*** which is, in connection with construction, approved, funded, authorized, administered or provided by the Board of Public Utilities, whether the assistance is received before, during or after completion of the construction . . . .
>
> For the purpose of implementing the provisions of this section, the Commissioner of Labor and Workforce Development shall exercise all powers and duties granted

---

[6] That result makes it unnecessary for the Court to reach HydroChem's remaining argument.

> by [the NJPWA] regarding the payment of the prevailing wage, and any worker employed in the performance of construction work subject to this section, and the employer or any designated representative of the worker, may exercise all rights granted to them by that act.

*Id.* (emphases added). Underpinning HydroChem's arguments is its position that public money must flow from the BPU to a utility for the statutory requisites to be met. As discussed below, the Court declines to adopt HydroChem's interpretation of the statute.

### 1. "Financial Assistance"

HydroChem argues that the Energy Strong program involved no BPU "financial assistance," pointing first to the language in § 48:2-29.47 defining that term as "any tax exemption, abatement or other incentive or any rebate, credit, loan, loan guarantee, expenditure, investment, grant, incentive, or other financial assistance . . . provided" by the BPU; "[i]n other words," it asserts, prevailing wages are only required "when the BPU directs *public funds* (in the form of financing or tax-credits) towards a construction project being built by a regulated entity." (Moving Br. 23 ("The relevant statute only applies when a regulated utility's construction project is paid for with public funding from the New Jersey Board of Public Utilities.")) Because rate increases don't involve the use of public funds, they posit, and Energy Strong was funded by rate increases, § 48:2-29.47 does not apply.

But HydroChem fails to explain why all of those terms (including, for example, tax abatements and exemptions) must necessarily involve public funds. In fact, its next argument, based on *ejusdem generis*, implicitly recognizes the opposite. "Under that canon of statutory construction, where general words follow specific words in a statutory enumeration, the general words are construed to embrace only objects similar in nature to those objects enumerated by the preceding specific words." *Wilson ex rel. Manzano v. City of Jersey City*, 209 N.J. 558, 584 (2012)

9

(citation and internal quotation marks omitted).[7] *See also Singh v. Uber Techs. Inc.*, 939 F.3d 210, 220 n.3 (3d Cir. 2019) (*ejusdem generis* "is a statutory canon through which, 'when a statute sets out a series of specific items ending with a general term, [the] general term is confined to covering subjects comparable to the specifics it follows'" (quoting *Hall St. Assocs., L.L.C. v. Mattel, Inc.*, 552 U.S. 576, 586 (2008)). It is "just one of many aids in construing a statute" and is not meant to be used to "defeat the obvious purpose of legislation." *Manzano*, 209 N.J. at 584-85 (citation and internal quotation marks omitted). Indeed, the "counter canon" is that "'more general words can indicate a statutory purpose to broaden the scope of the statute.'" *Id.* (citation omitted).

    HydroChem points to two "broad categories" of financial assistance in the statutory definition: (1) tax credits ("tax exemption, abatement or other incentive"), which are not involved here, and (2) what it refers to as "'financial assistance' in the form of payments or loans from the state" ("rebate, credit, loan, loan guarantee, expenditure, investment, grant, incentive, or other financial assistance"). (*See* Moving Br. 26.) As to the second category, HydroChem argues that "incentive" should be construed in line with the terms preceding it as limited to scenarios involving payments from the state. But as plaintiffs note, "incentive" is not the last term in the list; "other financial assistance" is. (Opp. Br. 21.) *Ejusdem generis*, then, would counsel that "incentive" is one of the terms informing the construction of "other financial assistance." An "incentive" is something that prompts a particular behavior or response. (*See Cosgrove*, D.E. 136, 11/30/20 Op. 10 (parties there, citing a dictionary definition, agreed that "incentive" means "something that motivates or encourages one to do something"); Reply Br. 7 n.1 (defining "incentive," when appearing on its own, to mean "something that incites or has a tendency to incite to determination or action" (quoting Webster's Third New International Dictionary (1981).). *Cf.* Black's Law

---

[7] New Jersey substantive law applies, as the Court is sitting in diversity. *Garza v. Citigroup*, 724 F. App'x 95, 99 (3d Cir. 2018) (citation omitted).

10

Dictionary (11th ed. 2019) (defining "tax incentive" to mean "[a] governmental enticement, through a tax benefit, to engage in a particular activity"). So construed, this term does not require public funds, and does not exclude incentive ratemaking by the BPU as a form of "financial assistance."

The same reasoning defeats HydroChem's argument based on *noscitur a sociis*, the principle that a word's meaning can be indicated and controlled by associated words; literally, "it is known from its associates," *Isetts v. Borough of Roseland*, 364 N.J. Super. 247, 257 & n.4 (App. Div. 2003)). Here, the words "associated" with "financial assistance" (or even with "incentive") do not invariably require "the direct or indirect transfer of funds from the state" (Moving Br. 27). This is so regardless of the order in which they appear in the statute (*i.e.*, at the end of the list or elsewhere). (*Cf.* Reply Br. 2-5.)

HydroChem's other arguments also fail to persuade. HydroChem suggests that because the BPU's "primary purpose" is to exercise authority over utility rate approval requests, the Legislature *must* have intended to exclude rate approvals as a form of "financial assistance" because § 48:2-29.47 does not expressly refer to them. But at most this shows that rate requests untethered from construction the BPU wants to encourage or motivate (*i.e.*, what the Court referred to in *Cosgrove* as "routine" rate approvals) would not be within the statute's purview.[8] Here, the amended complaint alleges that the Energy Strong program (and ultimately, the work plaintiffs did) arose from BPU efforts to encourage utility infrastructure investment through the use of rate increases (in the form of accelerated cost recovery and favorable depreciation treatment) that fell

---

[8] HydroChem cites a legislative committee report providing that § 48:2-29.47's prevailing wage requirements don't apply to "any construction undertaken by a utility or other business which does not receive assistance from the board in connection with the construction, even if the utility or other business is regulated by the board." (Moving Br. 28-29.) This does not illuminate what "assistance" means, and in any event what plaintiffs allege here is a process outside the normal regulatory processes undertaken by the BPU.

11

outside the context of normal ratemaking procedures. (Am. Compl. ¶¶ 26-33, 41-63, 67-77.) In other words, plaintiffs have alleged a BPU "incentive," and by extension "financial assistance," in a manner that permits them to survive the motion to dismiss.

### 2. "Workers"

HydroChem also argues that plaintiffs are not "workers" under N.J.S.A. § 48:2-29.47 because under a different statute, the NJPWA, the term only includes persons performing services on a "public work." A "public work," it continues, involves either public funds or public land, neither of which was the case here.

The Court rejected that argument in *Cosgrove*, and rejects it here. Briefly, the plain text of N.J.S.A. § 48:2-29.47 – which is the starting point for any interpretation of a New Jersey statute, *Lembo v. Marchese*, 242 N.J. 477, 486 (2020) (citing *DiProspero v. Penn*, 183 N.J. 477, 492 (2005)) – contains no "public works" or other similar limitation on the meaning of "workers." And as HydroChem itself observes, the statute expressly references the NJPWA twice: first to say how "prevailing wages" will be determined (as they are determined under the NJPWA) and next to say how, and by whom, the statute will be implemented (by the labor commissioner exercising "all powers and duties" granted under the NJPWA, and by "any worker employed in the performance of construction work subject to this section, and the employer or any designated representative of the worker" exercising "all rights granted to them by" the NJPWA). N.J.S.A. § 48:2-29.47. (*See* Moving Br. 32.) It also excludes from its scope contracts below a threshold amount for municipalities that is set forth in § 34:11-56.26(11)(a) of the NJPWA. *Id.* § 48:2-29.47. There is no cross-reference to the definitions of the NJPWA, a conspicuous absence given the other references to that statutory scheme.

HydroChem tries to make the cross-reference to any "workers" being able exercise "all rights" granted to them by the NJPWA into a cross-reference to the definitions of the NJPWA. But no "right" would be granted by following that reasoning here. The NJPWA defines "worker" to include various categories of persons "employed by any contractor or subcontractor and engaged in the performance of services directly upon a public work." N.J.S.A. § 34:11-56.26(7). "Public work," in turn, means construction, reconstruction, demolition, and other enumerated tasks "done under contract and paid for in whole or in part out of the funds of a public body" or on property owned or leased by a public body. *Id.* § 34:11-56.26(5). A "public body" is defined as "the State of New Jersey, any of its political subdivisions, any authority created by the Legislature of the State of New Jersey and any instrumentality or agency of the State of New Jersey or of any of its political subdivisions." *Id.* § 34:1-56.25(4). The upshot of importing these definitions into § 48:2-29.47 would be to limit its scope (not grant a right) by imposing a "public work" requirement for plaintiffs to rely on that statute.

As the Court observed in *Cosgrove*, since enacting the NJPWA, New Jersey has extended prevailing wage protections to a variety of settings. *See, e.g.*, N.J.S.A. § 5:12-161.3 (requiring prevailing wages for workers on certain projects involving Casino Reinvestment Development Authority incentives or financial assistance); N.J.S.A. § 18A:72A-5.1 (same, for certain projects involving New Jersey Educational Facilities Authority incentives or financial assistance). Accepting HydroChem's argument would essentially nullify those efforts.

The Court concludes that Count II pleads sufficient facts to avoid dismissal under Fed. R. Civ. P. 12(b)(6). Whether plaintiffs can ultimately prevail on the merits is not the question; they have "raised a reasonable inference that discovery will reveal evidence of the elements necessary to establish [their] claims." *Connelly v. Lane Constr. Corp.*, 809 F.3d 780, 793 (3d Cir. 2016).

## IV. Conclusion

For the reasons set forth above, HydroChem's motion to dismiss is granted in part and denied in part. Count I is dismissed with prejudice. The motion is denied as to Count II, which may proceed.

Dated: September 30, 2022                                     /s/ Katharine S. Hayden
                                                              Katharine S. Hayden, U.S.D.J.